UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BOBBIE BOWEN,

                   Plaintiff,

     v.                              Case No. 18-cv-675-pp

NICHOLAS A. BREDEMANN,
NICOLE WILLIAMS, and JOHN DOES,

                   Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 21), DISMISSING DEFENDANTS WILLIAMS AND DOES AND DISMISSING THE CASE**

     Plaintiff Bobbie Bowen is a former Wisconsin prisoner. Representing himself, he filed this lawsuit under 42 U.S.C. §1983. Dkt. No. 1. The court allowed him to proceed on claims of excessive force, retaliation and failure to intervene based on a series of incidents that occurred in April 2015 while he was in the process of being released from Columbia Correctional Institution. Dkt. No. 4. In September 2019, the defendants moved for summary judgment. Dkt. No. 21. In October 2019, counsel appeared on behalf of the plaintiff, dkt. no. 31, and has represented the plaintiff through the briefing of the summary judgment motion.

**I.    Doe Defendants**

     When the court screened the plaintiff's complaint in December 2018, it allowed him to proceed against "Doe defendants" based on allegations that

these unidentified officers used excessive force against him when they allegedly 1) threw him against the officer station window and 2) cut off his clothes and dragged him naked down the hallway. Dkt. No. 4 at 9. The court advised the plaintiff that he would be able to use discovery to learn the real names of the Doe defendants. Id. at 11. Discovery closed on September 17, 2019—over six months after the date the court issued its scheduling order (dkt. no. 8). On September 18, 2019, the plaintiff (still representing himself) filed a motion to extend the deadline for discovery by thirty to sixty days. Dkt. No. 29. Magistrate Judge Joseph scheduled an October 11, 2019 hearing on the motion. Dkt. No. 30.

When plaintiff's counsel joined the case on October 4, 2019, he asked Judge Joseph to adjourn that hearing and give him time to file a brief in support of the plaintiff's *pro se* motion to extend discovery and to reset discovery deadlines. Dkt. No. 32. Judge Joseph left the October 11 hearing on the calendar; the minutes reflect that she denied the motion to extend discovery "as moot, with understanding that counsel will file an amended motion." Dkt. No. 34. The plaintiff never filed an amended motion—through counsel or otherwise. The plaintiff never has identified any Does or asked to substitute their real names. While the video of the first incident isn't available (which the court discusses below), there is a video of the second incident, and the officers involved in the second incident identify themselves on the video. Yet the plaintiff didn't ask the court to add the names of those defendants.

2

Because the plaintiff has not pursued his claims against the Doe defendants, the court will dismiss them from the lawsuit.

## II. Video Evidence

As indicated above, the court allowed the plaintiff to proceed on excessive force claims based on two related "incidents." The first involved the plaintiff's allegations that the Doe defendants smashed his face into the officer station window, then dragged him outside of the housing unit. Dkt. No. 4 at 8–9. The second has to do with what happened after he was placed in the intake shower, which involved him being strip searched and walked down the hall (allegedly naked). Id. at 9. During discovery, the plaintiff asked the defendants to provide video of both incidents. The defendants produced video only of the second series of events, the series that started in the intake shower.

In his brief in opposition to the motion for summary judgment, the plaintiff tells the court that federal courts have the authority to impose sanctions when parties spoliate evidence in violation of a court order. Dkt. No. 35 at 3 (quoting Lekkas v. Mitsubishi Motors Corp., 2000 U.S. Dist. LEXIS 12016, *9-11.)[1] The plaintiff says that the defendants' resistance to providing the video of the first incident has deprived him of evidence "which would clearly rebut many of the claims of the Defendants' reports and subsequent affidavits."

---

[1] The citation is incomplete, including neither the court nor the year of decision.

3

Dkt. No. 35 at 3. He alleges that the defendant, "a correctional institution,"[2] has had control of the video and has represented to the court that "the First Video would be produced," but that it has not been. Id. at 4. The plaintiff accuses the defendants of needlessly prolonging the case and failing to produce critical evidence. Id. He asks the court to "afford Plaintiff a certain leniency it might not otherwise consider as it does in another case where all crucial evidence has been tendered by the moving party in discovery and the bells of judgment are beginning to ring for the non-movant on a fair and level playing field." Id. He asks the court to consider his affidavit "with greater weight especially as applied through the lens of the Federal Rules of Evidence 803(1), (2), (3), (4), (7) and (10), then it would ordinarily in light of the absence of the First Video." Id. at 4-5. Finally, he asserts that the second video was filed "within minutes of the First Video's conclusion. Id. at 5.

The plaintiff is correct that under the Federal Rules of Civil Procedure federal courts have the authority to sanction parties for spoliation of evidence. Fed. R. Civ. P. 37(b)(2). When a party asks for a sanction for spoliation, courts conduct a two-part inquiry: first, the court must find that the party had a duty to preserve evidence because it knew or should have known that litigation was imminent, and second, the court must find that the evidence was destroyed in

---

[2] The defendant is not a correctional institution. There are two individual defendants.

4

bad faith. <u>See</u> <u>Trask-Morton v. Motel 6 Operation L.P.</u>, 534 F.3d 672, 681 (7th Cir. 2008).

It appears that the defendants did not provide the video because it doesn't exist. Columbia Correctional Institution, where the plaintiff was an inmate at the time of the incident, has a digital surveillance system. Dkt. No. 39 at ¶4. It records continuously and stores the footage for approximately thirty days before being recorded over. <u>Id.</u> If a significant incident occurs (like an assault, cell entry or emergency), a security supervisor typically downloads the video footage. <u>Id.</u> The supervisor might use it as part of an investigation or to support a conduct report. <u>Id.</u>

A review of institution records reveals that no one issued a conduct report to the plaintiff related to the incident, and "[i]t is likely that a security supervisor did not follow with a conduct report and/or download the footage from the digital recording system because [the plaintiff] was in the process of being released from the institution." <u>Id.</u> at ¶7. He didn't file an offender complaint about the incident until three-and-a-half months later, well beyond the thirty days the system keeps footage before recording over it. <u>Id.</u> at ¶8. By the time the plaintiff filed his federal civil rights lawsuit, three years had passed. Dkt. No. 1. And by the time he made his first discovery request in March 2019, it had been nearly four years since the incident. Dkt. No. 40 at ¶4.

5

The court also notes that it is the plaintiff's burden to show that the evidence was destroyed in bad faith. Bracey v. Grondin, 712 F.3d 1012, 1019 (7th Cir. 2013). He hasn't met that burden. The plaintiff first asked for the first video in a discovery request dated March 21, 2019 (which he filed with the court). Dkt. No. 10. There was discussion of a video (the minutes do not say which one) at a hearing before Judge Joseph on August 19, 2019. Dkt. No. 18. Judge Joseph told the parties that if they could not reach agreement regarding the video, they were to contact the court. Id. On September 19, 2019, the plaintiff filed his *pro se* motion asking for an extension of the discovery deadline because he had asked for video but defense counsel was "refusing" to produce it. Dkt. No. 29. As the court has noted, on October 11, 2019, Judge Joseph denied the motion as moot with the understanding that plaintiff's counsel would file an amended motion. Dkt. No. 34. Counsel never filed an amended motion for discovery, or a brief in support of the request for an extension of the discovery deadline. The plaintiff never has filed a motion to compel under Rule 37. According to counsel for the defendants, the plaintiff's attorney never contacted her about the video. Dkt. No. 40 at ¶18. The court has no idea what the defendants told the plaintiff about the video. It knows only what the defendants have told the court in their summary judgment materials—that it appears the video was destroyed under routine policy. The plaintiff has not provided a reason for the court to believe otherwise. The court

6

has no basis for concluding that the defendants are guilty of spoliation, and it will not accord the plaintiff greater leniency or his affidavit greater weight.

The court understands that if it still existed, the first video might have shown the identities of the Doe defendants whom the court has dismissed. It might have helped the plaintiff learn the identities of those defendants. But that is not the only means the plaintiff had to learn the identities of the Doe defendants. The incident reports list the officers involved in the day room incident and the officers on the cell extraction team. Dkt. No. 26-1. The fact that if the video still existed it might have given the plaintiff another way to identify the Doe defendants has no impact on the court's conclusion.

## III. Motion For Summary Judgment (Dkt. No. 21)

In his response to the motion for summary judgment, the plaintiff states that he is no longer pursuing his First Amendment retaliation claim. Dkt. No 25 at 2, n.1. That is the only claim against defendant Williams, so the court will dismiss her from the lawsuit. Because the plaintiff never asked the court to add the real names of the Doe defendants, he has no one against whom to proceed on the claim that his head was slammed into the officer station window. That leaves the plaintiff's claims that Bredemann subjected him to excessive force and failed to intervene to protect him.

### A. Relevant Facts

Civil Local Rule 56(b)(2)(B) requires that a party who opposes a motion for summary judgment must, within thirty days of service of the summary

7

judgment motion, file "a concise response to the moving party's statement of facts." The response should include "a reproduction of each numbered paragraph in the moving party's statement of facts." Civil L.R. 56(b)(2)(B)(i). If the responding party disagrees with a proposed fact, he also must include "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon." Id. In filing his own proposed findings of fact, the party also must cite to the record to support those facts. Civil L.R. 56(b)(2)(B)(ii).

The plaintiff's response to the defendants' proposed findings of fact did not reproduce the defendants' numbered paragraphs and did not cite the record in the instances in which he disagreed with a proposed finding. Dkt. No. 36 at pp. 1-8, ¶¶1-102. His own proposed findings of fact do not cite to the record. Id. at pp. 8-10, ¶¶1-17. The court requires unrepresented parties to follow these rules; it certainly requires counsel to follow them. Because the plaintiff did not adhere to the court's rules in responding to the defendants' proposed findings of fact or in filing his own, the court will consider all the defendants' proposed findings of fact to be uncontested for purposes of summary judgment. It will not consider the plaintiff's proposed facts because they are not supported by any citation to the record. The court will consider the plaintiff's affidavit to the extent that it is based on personal knowledge. Dkt. No. 35-1.

8

The plaintiff was in the custody of the Wisconsin Department of Corrections at all times relevant to the lawsuit. Dkt. No. 23 at ¶1. Defendant Bredemann was employed as a Supervisory Officer 1 (Lieutenant) at Columbia Correctional Institution. Id. at ¶2.

At Columbia, all inmate releases occur on Tuesdays. Id. at ¶15. On the Sunday before release, it is standard practice for an inmate to pack up his property and have it inventoried by staff in the Property Department. Id. Property staff document the inmate's property to ensure he has everything he came in with and isn't leaving with anything that isn't his. Id. at ¶16. The inmate must sign the inventory form upon admission to and release from Columbia. Id. at ¶17. When it's time for an inmate to be released, officials take him to Intake, where inmates are processed both in and out of the institution. Id. at ¶18. Inmates are placed in the shower area to change from state-issued clothing to their release clothing and then released. Id. at ¶19. If an inmate has complied with the advance packing procedure, his inventoried property is boxed up and waiting for him at Intake for him to take with him when it's time to leave the institution. Id. If an inmate hasn't complied with the advanced packing procedure, his property is inventoried and boxed after he's left and then shipped to his address. Id. at ¶21.

The plaintiff was scheduled to be released on April 25, 2015. Id. at ¶22. Around 3:30 p.m. that day, Bredemann was notified by another officer that the plaintiff was in the dayroom refusing to go to Intake for release. Id. at ¶23. The

9

plaintiff was upset because he wouldn't be allowed to leave with his property because it hadn't yet been inventoried. Id. He'd been told to pack up on both Sunday and Monday but refused. Id. at ¶24. Apparently the plaintiff disagreed with the idea that his property would have to be shipped to him; at his deposition, the plaintiff testified, "The only reason why I did not move or go anywhere is because [Bredemann] refused to give me a receipt for my personal property, and he refused to inventory my personal property." Id. at ¶25. The plaintiff asserted that it did not make sense that staff could not take ten or fifteen minutes to inventory the property so that he could go home with it. Id. at ¶26. Bredemann says that he had to get the plaintiff to Intake so he could be released because the transport officers were planning to take the plaintiff and another inmate to catch a Greyhound bus. Id. at ¶27.

In light of what he describes as the plaintiff's "disruptive behavior," Bredemann decided to put the plaintiff in handcuffs to escort him to Intake. Id. at ¶28. The plaintiff refused to submit to handcuffs and "began to parade around the dayroom yelling at other inmates to join in on his argument." Id. at ¶29. Characterizing this behavior as "disruptive" and a "serious security concern in a prison," Bredemann called in three more officers to support him. Id. at ¶¶30–31. Bredemann also presented a Taser, but the plaintiff continued to refuse Bredemann's directives. Id. at ¶32. Staff ultimately got control of the plaintiff and escorted him to Intake. Id. at ¶33. They secured him in the Intake shower and removed the handcuffs. Id. at ¶34.

10

During his deposition, the plaintiff testified that he had his boxes of property out on a table. Dkt. No. 19 at 29.[3] He was frustrated that officials were telling him he couldn't take his property because it hadn't been inventoried and they wouldn't inventory it then so he could take it with him. Id. at 17–31. He denied refusing the leave the dayroom. Id. at 31–32. But he testified that Bredemann asked him to put his hands behind his back, and he complied. Id. at 31, 34, 35. He also testified that Bredemann showed him a Taser and directed the plaintiff to turn around. Id. at 35–37. He specifically said that Bredemann did not handcuff him. Id. at 37. But he testified that after he was handcuffed, "they" rushed him and then "picked" him up and "smashed" him into the officer station window. Id. at 37–38. Then they dragged him backwards in handcuffs. Id. at 38.

When it came time for the plaintiff to get out of the shower and be released, he refused. Dkt. No. 23 at ¶35. He continued to argue about his property, demanding that staff inventory it before he left. Id. Due to time constraints, the transport officers left without the plaintiff so the other inmate being released could catch the Greyhound bus. Id. at ¶36. Bredemann contacted the Security Director to inform him of the situation, and the director suggested asking the plaintiff's probation and parole agent to possibly place a

---

[3] The court refers to the page of the transcript, rather than the page of the docketed document.

detainer on him. Id. at ¶37. Bredemann contacted the agent (defendant Williams, whom the court has dismissed), and after talking with her supervisor, she faxed Bredemann an order requiring the plaintiff to be detained at the Columbia County Jail. Id. at ¶¶38–42. Williams asked Bredemann to call her if the plaintiff did not leave under his own steam and Columbia County did not take him into custody. Id. at ¶42. A police officer from Portage came to Columbia Correctional Institution from the Columbia County Jail and tried to get the plaintiff to come with him, but the plaintiff refused, continuing to argue about his property. Id. at ¶43. The plaintiff threatened to fight the police if they tried to transport him; according to the Portage police officer's report, Bredemann decided to hold the plaintiff at Columbia Correctional Institution until the prison administration could figured out how to safely transport him. Id. at ¶44.

Bredemann's next step was to contact the deputy warden, who authorized the use of force and a Taser to get the plaintiff to comply; she also suggested Bredemann contact the warden. Id. at ¶45. When Bredemann talked to the warden, however, he learned that the plaintiff's actual mandatory release date was May 3, 2015, which meant he could be held at Columbia Correctional Institution and not transported to a jail. Id. at ¶46. The warden suggested following through with the planned use of force, then detaining the plaintiff in the Restrictive Housing Unit ("RHU") instead of transporting him to a jail. Id. at

12

¶47. They planned to discuss transfer of custody more thoroughly the next day.
Id.

Next, Bredemann assembled a four-person cell entry team to remove the plaintiff from the Intake shower. Id. at ¶48. A cell entry team is used when verbal communication fails to gain an inmate's compliance and force becomes necessary. Id. at ¶49. The team enters an area to safely secure and control an inmate through the use of trained applications of dynamic techniques and applies restraints so that the inmate can be removed from the area and the situation can be controlled. Id. Bredemann started video documentation and again instructed the plaintiff to comply and to submit to restraints. Id. at ¶50. The plaintiff refused to stand up or turn around to have wrist restraints placed so he could be removed from the shower. Id. He laid on the floor and said he wanted his property and "just wanted to stay put." Id. at ¶51.

The cell entry team and Bredemann arrived at the Intake shower as a show of force to try to gain the plaintiff's compliance. Id. at ¶52. Bredemann again asked the plaintiff if he was ready to come out, and the plaintiff replied he was "just going to lay here." Id. at ¶53. Bredemann asked again, "Are you going to come out and comply?" Id. at ¶54. The plaintiff responded that he wanted his property and posed no threat. Id. The plaintiff refused to stand up. Id. at ¶55.

Bredemann left with the cell entry team and returned with a Taser, which he showed to the plaintiff and asked if the plaintiff was going to comply.

Id. at ¶56. The plaintiff against refused to stand up and submit to wrist restraints. Id. The cell entry team then entered the cell to restrain the plaintiff. Id. at ¶57. Upon entry, the team ordered the plaintiff to turn onto his stomach, but he made no efforts to comply and the team had to physically turn him over. Id. at ¶58. Bredemann was watching from outside the shower. Id. at ¶59. The cell entry team eventually got the plaintiff turned onto his stomach and applied restraints. Id. at ¶60. They brought the plaintiff to his feet with one officer controlling one of his arms, one officer controlling the other and a third officer using a head stabilization technique (one hand on the plaintiff's forehead and the other on his chin). Id. The defendants explain that it is important to control the head because it makes it easier to control the body and it protects staff from being head butted or spit on. Id. at ¶61.

The cell entry team tried to walk the plaintiff backwards to the Health Services Unit ("HSU"). Id. at ¶62. Walking backwards helps to throw off the inmate's equilibrium and causes confusion, another technique to protect staff members' safety. Id. at ¶63. During a typical backwards walk, the inmate walks on his own accord, but the plaintiff was holding up his legs, using his dead weight tactic as a form of noncompliance. Id. at ¶64. Bredemann ordered the cell entry team to place the plaintiff in a restraint chair because he refused to walk. Id. at ¶65. Bredemann also believed the restraint chair would help the nurse safely assess the plaintiff. Id.

14

Whenever a use of force occurs, a nurse from the HSU completes a medical assessment of the inmate. Id. at ¶66. A nurse completed a medical assessment of the plaintiff and stated she saw "a little abrasion" over his eye but otherwise he had no "traumatic injury." Id. at ¶67.

Bredemann then ordered the cell entry team to take the plaintiff to a strip search cell in the RHU. Id. at ¶69. Conducting a strip search is standard procedure whenever an inmate is being transferred to the RHU. Id. at ¶70. In this case, because of his behavior, the plaintiff was being placed into control status in the RHU, which necessitated the strip search. Id. at ¶71.

There are two types of strip searches: a visual search and a staff-assisted search. Id. at ¶72. For a visual search, the inmate is taken to a small cell (called a strip cell); the restraints are removed once the inmate is in the cell and the inmate is allowed to move all his own body parts. Id. at ¶73. If an inmate does not voluntarily comply with a visual search, a staff-assisted search may be conducted. Id. at ¶74. In a staff-assisted search, a staff member uses a knife or scissors to remove the inmate's clothing while verbalizing all steps being taken. Id. at ¶75. Once his clothes are removed, an inmates' mouth, hair, ears, fingers, armpits, feet and toes are checked, and the staff member uses bladed hands to check underneath the inmate's penis and scrotum and between the inmate's buttocks. Id. The plaintiff refused to answer when asked if he would comply with a visual search, so a staff-assisted search was conducted in accordance with Wis. Admin. Code §DOC 306.17(2). Id. at ¶76.

15

The team removed the plaintiff from the chair and cut off his clothes to do a strip search. Id. at ¶77. Bredemann observed the search and didn't see any inappropriate conduct by security staff during the search. Id. at ¶78. He asked for a towel to place around the plaintiff's private area. Id. at ¶79. Staff then escorted the plaintiff to cell 14 in the RHU with the towel secured around his private areas. Id. at ¶80. During the escort, the plaintiff said his back was going out, so staff turned him around so they could support most of his weight. Id. at ¶81.

When questioned at his deposition about why he thought the strip search was a sexual assault, the plaintiff said it was "[b]ecause they cutting off my clothes without my permission. It wasn't—there's no reason, no valid reason to cut off my clothes when all you had to do was check my property." Id. at ¶84. He agreed that the search was the same routine search conducted when he arrived at the institution but felt the circumstances were different because he was supposed to be on his way out. Id. at ¶85.

B.     Discussion

1.     *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir.

16

2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." <u>Anderson</u>, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

2. *Analysis*

The court allowed the plaintiff to proceed on a claim that Bredemann used excessive force by cutting off the plaintiff's clothes and dragging him naked down the hall and by locking him in the Intake shower. Dkt. No. 4 at 8–9. The court also allowed him to proceed on a claim that Bredemann failed to intervene when the cell extraction team allegedly assaulted the plaintiff in the Intake shower. <u>Id.</u> at 10.

17

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits "unnecessary and wanton infliction of pain" on prisoners. Hudson v. McMillian, 503 U.S. 1, 5 (1992). In cases involving the use of excessive force, the question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. Factors in determining whether the use of force was wanton and unnecessary include "the need for an application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" Id. (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)).

Nothing in the record, including video of the incident that spanned the time the plaintiff was secured in the Intake shower to arrival in the RHU, supports a finding the Bredemann ever personally used any force against the plaintiff. Liability under §1983 is limited to employees who are personally responsible for depriving a plaintiff of a constitutional right. Burks v. Raemisch, 555 F.3d 592, 595–96 (7th Cir. 2009). Bredemann never touched the plaintiff, so he wasn't personally involved in the strip search or in walking the plaintiff down the hallway. The plaintiff complains that Bredemann locked him in the Intake shower, but that does not constitute force of any kind, much less excessive force. Securing the plaintiff in the Intake shower area was part of the process of releasing the plaintiff from the institution. Dkt. No. 23 at ¶19. The plaintiff was put in the shower and his handcuffs were removed. Id. at ¶34.

18

It was the plaintiff who refused to leave the shower so that he could be released. Id. at ¶35.

It does appear that Bredemann was a supervisor. He's listed as the supervisor on the incident reports for the incident in the dayroom. Dkt. No. 26-1 at 1–5. And he "ordered" the cell extraction team to put the plaintiff in a restraint chair and to take the plaintiff to a strip search cell in the RHU. Dkt. No. 23 at ¶¶ 65, 69.

Supervisors can be held liable for the conduct of supervisees if the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent. Hildebrandt v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003). The supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Id. (quoting Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)).

None of the officers used excessive force—at Bredemann's direction or otherwise. The court has reviewed the video footage of the cell entry team extracting the plaintiff from the shower, walking him and placing him in a restraint chair, allowing the nurse to check him out, wheeling him to a strip search cage, performing the strip search and taking him to his cell in RHU. While the officers *did* use force—holding the plaintiff's forehead and chin, walking him backwards, holding his arms to lift him up, cutting off his clothes for the strip search and walking him to his RHU cell—none of it was excessive. No reasonable juror viewing the video could find that any of the officers used

19

force "maliciously and sadistically to cause harm." No one hit the plaintiff, no one pulled him too hard for no reason. At one point, when the plaintiff complained that his back hurt after the strip search, one of the officers asked him to turn around so they could give him more support. And though the plaintiff complains he was "dragged," the video shows the officers trying to get the plaintiff to support his own weight and walk on his own before placing him in the restraint chair on his way to the nurse. The next time they "walked" him, they purposely turned him around so they could offer him more support for his hurt back.

The plaintiff also complains about the strip search, though he agrees it was performed in the same way as when he was brought to the institution. Dkt. No. 23 at ¶85. Strip searches can violate the Eighth Amendment, but prison officials are permitted to touch, pat down and search a prisoner to make sure he isn't hiding anything dangerous on his person. <u>Whitman v. Nesic</u>, 368 F.3d 931, 934 (7th Cir. 2004). If that search is "conducted in a harassing manner intended to humiliate and inflict psychological pain," it is outside the bounds of what the Eighth Amendment allows. The record establishes that (1) the plaintiff had to be strip searched before being placed in a cell in the RHU to ensure that he would be safe, dkt. no. 23 at ¶¶70–71, and (2) the plaintiff refused to help by moving his own body parts so the officers could visually inspect him without needing to touch him, <u>id.</u> at ¶76. Nothing in the record

supports a finding that the officers conducted the search in a way to humiliate the plaintiff.

The same is true with taking the plaintiff to the RHU. Because he refused to comply with the visual search, staff cut off the plaintiff's clothes per protocol. Dkt. No. 23 at ¶75. Bredemann asked for a towel to cover the plaintiff's genitals, and the towel remained on the entire time the plaintiff was being taken to the RHU.

The plaintiff makes much of the fact he wasn't a threat—as in he wasn't doing anything physically or verbally threatening. Having watched the video, the court agrees that the plaintiff was not fighting back or threatening the officers verbally. But that's not why Bredemann needed to call the cell extraction team. Bredemann called the cell extraction team because the plaintiff refused to comply with orders and refused to leave the shower area. So, while he was not physically or verbally combative, he was disruptive and failing to follow directives. Applying force "in a good-faith effort to maintain or restore discipline" does not violate the Constitution. Hudson, 503 U.S. at 7.

Because none of the officers used force "maliciously or sadistically," but instead to restore order, they did not use excessive force, so Bredemann could not have directed or condoned any use of excessive force. Because no reasonable fact finder could conclude that the officers used excessive force against the plaintiff, his claim that Bredemann failed to intervene in the use of

21

excessive force also fails. See Fillmore v. Page, 358 F.3d 496, 506 (7th Cir. 2004). Bredemann is entitled to summary judgment.

## IV. CONCLUSION

The court **DISMISSES** defendant Nicole Williams and the Doe defendants.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 21. The court **DISMISSES** this case and will enter judgment accordingly.

This order and the judgment to follow are final. The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 30th day of September, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

22